UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-----------------------------------------------------------------X
LILLIAN JIMENEZ,                                    :

                  Plaintiff,              :         12 Civ. 3477 (GWG)

   -v.-                                              :         <u>OPINION AND ORDER</u>

MICHAEL J. ASTRUE, Commissioner of                  :
Social Security,
                              :
                Defendant.
-----------------------------------------------------------------X

**GABRIEL W. GORENSTEIN, UNITED STATES MAGISTRATE JUDGE**

      Plaintiff Lillian Jimenez brings this action pursuant to 42 U.S.C. §§ 405(g) and

1383(c)(3) to obtain judicial review of the final decision of the Commissioner of Social Security

("Commissioner") denying her claims for Disability Insurance Benefits and Supplemental

Security Income ("SSI") under the Social Security Act.  The Commissioner and Jimenez have

each moved for judgment on the pleadings pursuant to Rule 12(c) of the Federal Rules of Civil

Procedure.  For the reasons stated below, the Commissioner's motion is denied and Jimenez's

motion is granted.  The case is remanded to the Commissioner for further proceedings.

I.     <u>BACKGROUND</u>

     A.     <u>Jimenez's Claim for Benefits and Procedural History</u>

      Jimenez applied for disability benefits on January 2, 2009, alleging that she became

disabled on November 2, 2007.  <u>See</u> Administrative Record, filed Sept. 4, 2012 (Docket # 6)

("R."), 105.  She applied for SSI benefits on January 12, 2009.  R. 109.  She was insured for

benefits through December 31, 2012.  R. 19.  She was born on December 23, 1960, R. 105, and

most recently worked as a day care assistant, R. 31, 130, 167.

On April 14, 2009, the Commissioner denied Jimenez's application for disability and SSI benefits.  R. 48–54.  Jimenez requested a hearing before an administrative law judge ("ALJ").  R. 65–66.  A hearing before an ALJ was held on the matter on September 21, 2010.  See R. 29–45.  On October 7, 2010, the ALJ issued a decision finding that Jimenez was not disabled.  See R. 13–25.  She appealed the ALJ's ruling to the Appellate Council, R. 8, which denied her request for review on March 26, 2012, R. 1–7.  The ALJ's decision became final on this date as a result.  See R. 1.

After Jimenez filed the instant lawsuit seeking review of the ALJ's decision, the Commissioner moved for judgment on the pleadings and Jimenez cross-moved for judgment on the pleadings.[1]  The parties consented to this matter being decided by a United States Magistrate Judge pursuant to 28 U.S.C. § 636(c).

B.      The Administrative Record Before the ALJ

1.      Treating Source Records

Apart from several routine mammography examinations, see R. 225–29, the earliest treatment records in the administrative record are x-rays of Jimenez's hands, which were taken at Bronx Park Medical Pavilion on June 26, 2008, R. 222–23.  The x-rays showed "no evidence of acute fracture or dislocation of the visualized bones" and "no significant degenerative changes."

---

[1]   See Notice of Motion, filed Dec. 7, 2012 (Docket # 11); Memorandum of Law in Support of the Commissioner's Motion for Judgment on the Pleadings, filed Dec. 7, 2012 (Docket # 12); Motion for Judgment on the Pleadings, filed Jan. 8, 2013 (Docket # 15); Memorandum of Law in Support of Plaintiff's Motion for Judgment on the Pleadings, filed Jan. 8, 2013 (Docket # 16) ("Pl. Mem."); Reply Memorandum of Law in Further Support of the Commissioner's Motion for Judgment on the Pleadings and in Opposition to Plaintiff's Cross-Motion for Judgment on the Pleadings, filed Jan. 29, 2013 (Docket # 18).

Id.  The "bones and joints spaces that [were] visualized [were] within [a] normal range."  Id.

On August 21, 2008, Dr. Linotte Jean-Jeune, M.D., submitted a Treating Physician's Wellness Plan Report in which she indicated that she treated Jimenez regularly.  R. 178–79.  On the form, Dr. Jean-Jeune noted that Jimenez's blood pressure was 148/84, which was "not ideal."  R. 178.  She diagnosed Jimenez with anemia, fatigue, and hypothyroidism.[2]  Id.  In the portion of the form that asked for a "wellness plan," Dr. Jean-Jeune wrote that Jimenez was "still being monitored."  R. 179.  In a section of the form titled "functional capacity," Dr. Jean-Jeune checked a box indicating that Jimenez was "temporarily unemployable."  Id.  The form asked Dr. Jean-Jeune to "specify [a] timeframe you expect your patient will be able to participate in work-related activities with or without limitations."  Id.  Dr. Jean-Jeune did not specify any timeframe.  Id.

On September 24, 2008, at the referral of Dr. Jean-Jeune, Dr. Sudha Akkapeddi, M.D., conducted an electro-diagnostic evaluation on Jimenez.  R. 182–87.  Dr. Akkapeddi noted that Jimenez complained of pain and numbness in both hands for the past two to three years.  R. 182.  Specifically, she complained of decreased sensation in the third and fourth digits of her left hand.  Id.  She also complained of "bilateral shoulder and elbow pain" and a history of hypothyroidism.  Id.  Dr. Akkapeddi observed that Jimenez had a full range of active motion in her neck.  Id.  When deeply palpated, Jimenez had tenderness in the lateral elbow and supra-scapular area.  Id.  Testing revealed mild median sensory neuropathy — also known as mild carpal tunnel syndrome

---

[2]  Hypothyroidism is the "[d]iminished production of thyroid hormone" and is characterized by, among other things, "low metabolic rate, tendency to weight gain," and drowsiness.  Stedman's Medical Dictionary 866 (27th ed. 2000) ("Stedman's").

— in the right wrist.  Id.  Dr. Akkapeddi diagnosed wrist-hand derangement, fibromyalgia,[3] and mild carpal tunnel syndrome.  Id.  She recommended that Jimenez use a hand brace for three months and take the medication Lyrica.  Id.

On October 31, 2008, Dr. Jean-Jeune submitted another Treating Physician's Wellness Plan Report.  R. 180–81.  After reviewing Dr. Akkapeddi's report, she added the diagnosis of carpal tunnel syndrome and determined that Jimenez was unable to work for at least 12 months. Id.  Jimenez's course of treatment consisted of wearing a wrist brace and returning for a follow-up examination in three months.  R. 180.

On July 14, 2009, Dr. Jean-Jeune ordered that Jimenez undergo a magnetic resonance imaging ("MRI") of her cervical and thoracic spine.  R. 275, 277, 279, 291–92.  The cervical MRI revealed disc protrusions that encroached on the anterior subarachnoid[4] space without mass effect on the spinal cord at levels C4–C5, a posterior disc osteophyte[5] complex that also encroached on the anterior subarachnoid at levels C5–C6, and a "left posterior osteophyte arising from the inferior posterior endplate of C5 abutting the anterior surface of the [spinal] cord."  R. 275.  The thoracic spine was normal except for focal thickening of the posterior longitudinal ligament/annulus at T2–T3 with calcification encroaching on the anterior subarachnoid space. R. 277.

_____

[3]  Fibromyalgia is "[a] syndrome of chronic pain of musculoskeletal origin but uncertain cause."  Stedman's at 671.

[4]  The subarachnoid is the area beneath the arachnoid — the membrane that "lies within the vertebral canal and surrounds the spinal cord."  Stedman's at 119, 1715.

[5]  An osteophyte is "[a] bony outgrowth or protuberance" in the intervertebral discs. Stedman's at 1285.

4

In January 2010, Dr. Jean-Jeune referred Jimenez for foot x-rays, which revealed "[m]ild hallux valgus deformity [and] no significant degenerative change." R. 271.[6] On February 4, 2010, an abdominal sonogram revealed mild to moderate fatty infiltration of the liver and mild splenomegaly.[7] R. 270. Blood testing in August 2010 revealed that Jimenez had elevated levels of glucose and triglycerides, and had hemoglobin levels consistent with diabetes. R. 280–81. X-rays of Jimenez's left knee taken on August 20, 2010 showed "no fracture or joint effusion." R. 294.

On September 10, 2010, Dr. Jean-Jeune submitted a Physical Residual Functional Capacity Questionnaire. R. 298–302. She indicated that she examined Jimenez three to four times per year. R. 298. She diagnosed Jimenez with Type II diabetes, right carpal tunnel syndrome, hypothyroidism, hypertension, and degenerative disc disease of the cervical spine. Id. Dr. Jean-Jeune noted that Jimenez had paresthesia[8] of the upper and lower extremities. Id. Jimenez also had fatigue, weakness in the hands, reduced sensation, and intermittent moderate-to-severe achy pain in the hands, arms, and legs. Id. She took medication for neurological symptoms, hypertension, and hypothyroidism, and her diabetes was controlled through dieting. Id. Dr. Jean-Jeune checked the form to indicate that Jimenez's impairments would last at least 12 months and that her symptoms would frequently interfere with her attention and concentration, but she was capable of handling "moderate stress" during an eight-hour work day.

---

[6] Hallux valgus is "a deviation of the tip of the great toe, or main axis of the toe, toward the outer or lateral side of the foot." Stedman's at 784.

[7] Splenomegaly is the "[e]nlargement of the spleen." Stedman's at 1676.

[8] Paresthesia is "[a]n abnormal sensation, such as of burning, pricking, tickling, or tingling." Stedman's at 1316.

R. 298–99.  Dr. Jean-Jeune also indicated that Jimenez could only walk half a city block; sit for 45 minutes at a time; stand 30 minutes at a time; and sit, stand, or walk less than two hours over an eight-hour workday.  R. 299–300.  Jimenez could not lift 10 pound objects or twist, stoop, crouch, or climb.  R. 300–01.  She could rarely perform neck motions, such as looking up or down, or turning right to left.  R. 301.  She could not reach, perform fine manipulations with her fingers, or grasp with her right hand.  Id.  Jimenez could grasp with her left hand only five percent of the time.  Id.  In Dr. Jean-Jeune's opinion, Jimenez would likely be absent more than four times per month due to her impairments.  Id.  Dr. Jean-Jeune made no determinations concerning Jimenez's mental impairments.  R. 299.  Her assessment was limited to the time period after August 23, 2010.  R. 302.

Dr. Jean-Jeune later supplemented her opinion, in letters dated March 7 and March 10, 2011.  R. 304–05.  In those letters, she noted that Jimenez had a "chronic history of cervical spine/disc disease with symptoms of radiculopathy," as well as carpal tunnel syndrome in the right hand, numbness in the fingers, neck pain, diabetes mellitus, hypertension, and hypothyroidism.  Id.  Due to these impairments, Dr. Jean-Jeune opined that Jimenez was "not able to do any type of work for at least one year."  R. 305.

### 2. Federation Employment Guidance Service

On July 2, 2008, Jimenez was evaluated by the Federation Employment Guidance Service ("F.E.G.S.").  R. 160–77, 188–95.  During the evaluation, Jimenez reported that she left her employment after 24 years due to health problems.  R. 167.  She cited fatigue and waking up in the morning as barriers to employment.  Id.  Although she claimed to have never received mental health treatment and had no reported history of mental illness, her PHQ-9 score was a

nine, which indicated "mild" depression.  R. 165.[9]  She reported feeling tired or having little

energy nearly every day over the two weeks prior to the examination.  Id.  She also claimed that

for several days over the two weeks prior to the examination she was down, depressed, or

hopeless; had little interest or pleasure in doing things; had trouble sleeping; felt bad about

herself or that she was a failure; had difficulty concentrating; and moved and spoke slowly.  Id.

Jimenez reported neither suicidal ideation nor poor appetite.  R. 165–66.  She stated that she

spent her days walking her dog and going for walks, and that she was capable of washing

clothing, vacuuming, making beds, cooking meals, socializing, bathing and grooming herself.  R.

166–67.  She could travel independently by bus or train, but she reported an inability to walk

long distances due to fatigue and heart palpitations.  R. 166.  A social worker assessed that

Jimenez had adequate cognitive, home management, and interpersonal skills.  R. 167.

 In July 2008, Dr. Michael Ward, a F.E.G.S. Medical Director, examined Jimenez.  R.

170–74, 189.  Jimenez reported taking medications for hypertension, a thyroid condition, and

hand pain.  R. 168, 191, 197.  A physical examination revealed no abnormalities.  R. 170–71.  A

medical examination, however, revealed that "frequent fatigue imped[ed] [Jimenez's]

Occupational Function."  R. 170.  Dr. Ward diagnosed hyperthyroidism,[10] anemia, and fatigue,

---

 [9]  "PHQ–9 stands for 'Patient Health Questionnaire' and is used to assess and monitor the
severity of a patient's depression and/or anxiety."  Rodriguez v. Astrue, 2013 WL 1225394, at
*7 n.7 (E.D.N.Y. Mar. 27, 2013) (citation omitted).  It is a "self-administered depression
module."  Briscoe v. Astrue, 892 F. Supp. 2d 567, 570 n.1 (S.D.N.Y. 2012) (alteration, citation,
and internal quotation marks omitted).

 [10]  Hyperthyroidism is "[a]n abnormality of the thyroid gland in which secretion of
thyroid hormone is usually increased and is no longer under regulatory control of hypothalamic-
pituitary centers."  Stedman's at 856.  It is "characterized by a hypermetabolic state, usually with
weight loss [and] tremulousness, . . . [and] may progress to severe weakness, wasting,
hyperpyrexia, and other manifestations . . . ."  Id.  Jimenez contends that Dr. Ward's intended
diagnosis was hypothyroidism rather than hyperthyroidism because she was taking Synthroid, a

R. 173, and noted that she had hypertension, R. 171, 173.  He concluded that her "[u]nstable medical and/or mental health conditions . . . require[d] treatment (a Wellness Plan) before a functional capacity outcome [could] be made."  R. 173.  He placed Jimenez on a Wellness Plan for three months to treat her conditions before making a functional capacity determination.  R. 189–90.

### 3.   Dr. Aurelio Salon, M.D.

At the behest of the Commissioner, Dr. Aurelio Salon, M.D., of Industrial Medicine Associates, P.C., conducted a consultative internal medicine examination of Jimenez on March 18, 2009.  R. 230–33.  Jimenez's chief complaints were a thyroid problem, high blood pressure, and hand pain.  R. 230.  She had bilateral hand pain for a year, but had not been to physical therapy for her hands and had not been advised to get surgery.  Id.  She claimed to have been diagnosed with hypothyroidism, but noted that it was stable on medication.  Id.  She denied a history of heart disease or diabetes.  Id.  In 2007, she was told that she had high blood pressure, but according to Dr. Salon, there were no hospitalizations or symptoms.  Id.

Jimenez's daily activities included cooking, as well as cleaning, laundry, and shopping to a limited extent.  R. 231.  During a physical examination, Jimenez "appeared to be in no acute distress."  Id.  Her gait was normal; she could walk on her "heels and toes without difficulty"; she used no assistive devices; she changed her clothing for the examination without help; she had no difficulty getting on or off the examination table; and she rose from her chair without difficulty.  Id.  Her blood pressure was 126/80.  Id.  An examination of her spine revealed full flexion, extension, lateral flexion bilaterally, and full rotary movement.  R. 232.  In the upper

---

medicine prescribed for hypothyroidism.  Pl. Mem. at 4 n.5 (citing R. 191).

and lower extremities, Jimenez's strength was rated five out of five.  Id.  Her joints were "stable and nontender," her "[h]and and finger dexterity [was] intact," and her grip strength was rated five out of five.  Id.  Dr. Salon diagnosed a history of hypertension, hypothyroidism, carpal tunnel syndrome, and bunions.  Id.  In his opinion, there were "no objective findings to support the fact that the claimant would be restricted in her ability to sit or stand or in her capacity to climb, push, pull, or carry heavy objects."  R. 233.

### 4.   Dr. Haruyo Fujiwaki, Ph.D.

Also on March 18, 2009, Dr. Haruyo Fujiwaki, Ph.D., a licensed psychologist at Industrial Medicine Associates, P.C., performed a consultative psychological examination on Jimenez.  R. 234–37.  Jimenez stated that she arrived at the appointment by train.  R. 234.  She claimed to have never received treatment for a mental condition in the past.  Id.  She complained of having difficulty falling asleep and increased appetite, as well as depression since 2007 due to thyroid problems.  Id.  She felt tired all the time and had a loss of energy.  Id.  She became restless and irritable sometimes, but denied panic attacks, manic episodes, or psychotic symptoms.  Id.  She was cooperative during the examination, and "[h]er manner of relating, social skills, and overall presentation was adequate."  R. 235.  Her speech was adequate and her thought process coherent and goal driven.  Id.  However, she had an "[a]nxious" affect, had mild impairment in her attention and concentration, and moderate impairment in her recent and remote memory skills.  Id.

Her cognitive functioning was limited, but she was able to dress, bathe, and groom herself.  R. 236.  She sometimes cooked, cleaned, shopped for food, and did laundry.  Id.  She could manage money, take public transportation alone, and occasionally socialized.  Id.  But she had no friends and her relationship with family members was "fair."  Id.  She spent her days

walking her dog, going to the supermarket, and watching television.  Id.  Using the Diagnostic

and Statistical Manual of Mental Disorders ("DSM") system of classifications, Dr. Fujiwaki

diagnosed Depressive Disorder (not otherwise specified ("NOS")) and Anxiety Disorder (NOS)

on Axis I, and high blood pressure, a thyroid problem, pain in the hands, arms, and back, and

weakness in the hands on Axis III.  Id.  He opined that Jimenez was "able to follow and

understand simple directions and instructions.[11]  She can perform simple tasks independently."

Id.  She could keep a regular schedule, could "learn new simple tasks with extended time," and

"could relate with others and deal with stress to a certain extent."  Id.  However, "[s]he has some

difficulty maintaining attention and concentration. . . . [and] may have difficulty performing

complex tasks and making appropriate decisions due to limited academic abilities."  Id.

           5.     Dr. T. Harding

       On April 10, 2009, Dr. T. Harding, a state agency psychologist, prepared a functional

assessment of Jimenez's mental impairments.  R. 238–54.  Dr. Harding concluded that Jimenez

had Depression Disorder NOS and Anxiety Disorder NOS.  R. 238, 241, 243.  In a Psychiatric

Review Technique form, Dr. Harding indicated that Jimenez did not satisfy the listed criteria for

---

[11]  The DSM is "[a] system of classification, published by the American Psychiatric
Association, that divides recognized mental disorders into clearly defined categories based on
sets of objective criteria."  Stedman's at 492.  "DSM is widely recognized as the diagnostic
standard . . . ."  Id.  The DSM utilizes "a multiaxial system whereby different aspects of a
patient's condition could be separately assessed."  Id.  The axes are defined as follows:

|         |                                                              |
|---------|--------------------------------------------------------------|
| Axis I  | Clinical Disorders [and] Other Conditions That May Be a Focus of Clinical Attention |
| Axis II | Personality Disorders [and] Mental Retardation               |
| Axis III| General Medical Conditions                                   |
| Axis IV | Psychological and Environmental Problems                     |
| Axis V  | Global Assessment of Functioning                             |

Diagnostic and Statistical Manual of Mental Disorders 28 (4th ed., text revision 2000).

an Affective Disorder or Anxiety-Related Disorder as set forth in 20 C.F.R. Pt. 404, Subpart P.,

App. 1, §§ 12.04 and 12.06.  R. 241, 243.  Dr. Harding concluded that Jimenez had only mild

restrictions in her daily activity; mild difficulty maintaining social functioning; moderate

difficulties maintaining concentration, persistence, and pace; and had never had repeated

episodes of deterioration.  R. 248.  In a separate form, labeled Mental Residual Functional

Capacity Assessment, Dr. Harding indicated that Jimenez had no significant limitations in her

ability to understand and remember short and simple instructions, but that she had moderate

limitations in her ability to understand and remember detailed instructions.  R. 252.

Furthermore, due to symptoms of her psychological impairments, she had moderate limitations

in her ability to complete a normal workday without interruption or perform at a consistent pace

without unreasonable rest periods.  R. 253.  Dr. Harding adopted Dr. Fujiwaki's conclusion and

found that Jimenez was "capable of performing simple work activities on a sustained basis."  R.

254.

On April 8, 2009, S. Mastrogiacomo, a "Single-Decision Maker" ("SDM") with the state

agency, completed a Physical Residual Functional Capacity Assessment.  R. 256–61.

Mastrogiacomo completed the form based off Dr. Salon's report.  R. 260.  Mastrogiacomo

concluded that Jimenez had not established any physical limitations through objective evidence.

R. 257–60.

### 6.    September 21, 2010 Hearing

Jimenez testified before the ALJ on September 21, 2010.  R. 29–40.  She testified that

she lived in an apartment with her husband.  R. 31.  She previously worked at a day care center

with children for 24 years, but stopped due to health problems.  R. 31–32, 36.  In particular, she

stopped working because she "was on medication and [her] whole body hurt."  R. 32.  She had

pain all the way down her spine, and had pain in her hands, arms, and feet.  Id.  She had

difficulty holding objects, R. 38, and indicated that she was fatigued and "depressed a little bit,"

R. 33.  She also had a difficult time getting up in the morning.  R. 37.  Her conditions had

developed gradually.  R. 33.

Jimenez was being treated at St. Barnabas Medical Center.  Id.  She was prescribed

Lyrica for pain, Naproxen for swelling, and other medications for high blood pressure and

thyroid problems.  R. 37.  She stated that physical therapy and medication had helped with the

pain "a little bit," R. 32, but that the wrist braces she wore for carpal tunnel syndrome did little

to alleviate her pain, R. 38.  She was receiving neither medication nor therapy for her emotional

conditions.  R. 33.  She did not like psychiatric treatment because she did not like "to open up

too much."  R. 38.

Jimenez testified that she could only sit or stand for less than 10 minutes at one time and

that she could walk only half a city block.  R. 34.  She claimed to be unable to lift an object

weighing five to 10 pounds and said that she would have pain from lifting a one or two pound

object.  Id.  Her husband often accompanied her to the grocery store, and when he did not, she

only purchased small items.  R. 35.  Jimenez stated that she could do "light" cooking and

cleaning.  Id.  On an average day, she walked half a block, did exercises, watched television, and

read.  R. 35–36.  Jimenez testified that public assistance had exempted her from work programs.

R. 39.

C.    The ALJ's October 7, 2010 Decision

On October 7, 2010, the ALJ issued a decision denying Jimenez's request for disability

and SSI benefits.  See R. 13–25.  First, the ALJ concluded that Jimenez's disability insurance

coverage would end on December 31, 2012, and that she had not engaged in substantial gainful

activity since November 2, 2007.  R. 19.  Next, he summarized the evidence from acceptable

medical sources, R. 19–21, including the state agency forms completed by Dr. Harding, labeled

as Exhibits 5F and 6F, but not the form completed by SDM Mastrogiacomo, R. 21.  The ALJ

found that Jimenez had the following severe medically determinable impairments throughout the

coverage period: "right carpel [sic] tunnel syndrome, hyperthyroidism, degenerative disc disease

of the cervical spine, and anxiety/depression."  R. 21.  The ALJ rejected Dr. Akkapeddi's

diagnosis of fibromyalgia because "the record [did] not contain any evidence of persistent

positive triggering points."  R. 22.  Additionally, he found that Jimenez's anemia, hypertension,

hallux valgus deformity, and diabetes were not severe because they were "controlled either by

medication or diet, [and did] not cause more than minimal limitation in the claimant's ability to

perform basic work activities."  Id.

Jimenez's impairments did not meet or equal any of the impairments listed in 20 C.F.R.

Part 404, Subpt. P, App. 1.  Id.  Her mental impairments did not satisfy the criteria set forth in §

12.00.  Id.  Nor did her condition satisfy the listing for a musculosketal impairment pursuant to §

1.04, as the July 14, 2009 MRI of her cervical spine showed no evidence of nerve root

compression, spinal arachnoiditis,[12] or stenosis.[13]  Id.

The ALJ assessed that Jimenez had the residual functional capacity ("RFC") to lift, carry,

or pull 10 pounds frequently and up to 20 pounds occasionally; to sit, stand, or walk up to six

hours in an eight-hour day; and retained the capacity to understand, remember, and carry out

simple work instructions.  R. 23.  The ALJ found Jimenez's statement concerning the intensity,

---

[12]  Arachnoiditis is inflammation of the membrane that "lies within the vertebral canal and surrounds the spinal cord."  Stedman's at 119.

[13]  Stenosis is the "stricture of any canal or orifice."  Stedman's at 1695.

persistence, and limiting effects of her symptoms not credible.  R. 24.  He reasoned that the objective medical evidence was inconsistent with her testimony, her subjective complaints did not coincide with medical findings, and her benign treatment history was inconsistent with her allegations of disability.  Id.

The ALJ accorded "[l]ittle weight" to Dr. Jean-Jeune's opinion that Jimenez was unable to work.  Id.  He found that Dr. Jean-Jeune's opinion was "not well-supported by medically acceptable clinical and laboratory diagnostic techniques," was inconsistent with other substantial evidence including Dr. Jean-Jeune's own previous statements, and noted that "the issues of a claimant's 'inability to work' and her RFC are issues reserved to the Commissioner."  Id.  The ALJ gave "[g]reat weight" to Dr. Harding's assessment that Jimenez was capable of performing "simple work activities on a sustained basis . . . because of that source's understanding of SSA disability programs and their evidentiary requirements and familiarity with other information in the record."  Id.  Based on this RFC determination, the ALJ concluded that Jimenez could perform her previous work as a day care assistant.  R. 24–25.

D.      Proceedings Before the Appeals Council

On December 29, 2011, Jimenez submitted the following additional evidence to the Appeals Council.  See R. 307.  Dr. Marigem Lorenzo, M.D., from St. Barnabas Hospital began treating Jimenez on November 1, 2010, and examined her every one to two months thereafter. R. 308.  On March 1, 2011, Dr. Lorenzo observed during a physical examination that Jimenez had a rash, characterized by red bumps, all over her body which had been there for over a week. R. 320.  Jimenez additionally complained of chronic cervical spine pain and upper extremity tenderness.  R. 321–22.  Dr. Lorenzo referred Jimenez to a dermatologist and an orthopedic clinic, and recommended further testing.  R. 322.

14

On May 6, 2011, Dr. Hermant Pande of St. Barnabas Hospital conducted a follow-up examination after abnormal results from liver function tests.  R. 324.  Dr. Pande observed that Jimenez was fatigued and had neck pain shooting to her arms.  R. 323.  Her conditions included hypertension, diabetes mellitus, hypothyroidism, and cervical spondylitis.[14]  Id.  Dr. Pande discussed diet, exercise, and weight loss with Jimenez, and recommended a liver biopsy.  Id.

Dr. Lorenzo filled out a Multiple Impairment Questionnaire on August 15, 2011.  R. 308–15.  Her description of Jimenez's symptoms and limitations on the form applied prior to December 19, 2008.  R. 314.  Her diagnoses were "chronic cervical spondylosis [with] radicular symptoms[,] [right] carpal tunnel syndrome[,] generalized body pain . . . , Type II [diabetes mellitus] with paresthesia[,] [hypertension, and] hypothyroidism."  R. 308.  She noted that Jimenez was "not doing well [with] generalized pain."  Id.  She listed positive clinical findings of decreased sensation and strength in both of Jimenez's hands.  Id.  She described Jimenez's pain as "generalized," "achy," and "constant."  R. 309–10.  Dr. Lorenzo noted that Jimenez was taking medications and that she had attended physical therapy in August 2010.  R. 312.

Dr. Lorenzo rated, on a zero to 10 scale, Jimenez's pain as a nine or 10, and her fatigue as a six.  R. 310.  Jimenez's pain could not be "completely relieve[d] . . . with medication without unacceptable side effects."  Id.  In Dr. Lorenzo's opinion, over an eight-hour day, Jimenez could sit for "less than 1 hour," and could stand or walk for only 15 to 20 minutes.  Id.  She further opined that Jimenez could lift or carry objects weighing up to five pounds occasionally, and that Jimenez had marked limitations in her ability to reach or manipulate objects with her hands.  R. 311–12.  Jimenez's impairments were expected to last more than 12

---

[14]  Spondylitis is the "[i]nflammation of one or more of the vertebrae."  Stedman's at 1678.

months and would frequently interfere with her attention and concentration.  R. 313.  Although it was noted that Jimenez became "emotional when [she was] in pain," Dr. Lorenzo found that emotional factors did not contribute to the severity of her symptoms or functional capacity.  Id. Dr. Lorenzo concluded that Jimenez was incapable of even "low stress" work, id., and that she could not push, pull, kneel, bend, or stoop, R. 314.

On March 30, 2012, the Appeals Council denied review.  R. 1–7.

II.     APPLICABLE LAW

A.      Scope of Judicial Review under 42 U.S.C. § 405(g)

A court reviewing a final decision by the Commissioner must determine whether the Commissioner has applied the correct legal standard and whether the decision is supported by substantial evidence.  See Selian v. Astrue, 708 F.3d 409, 417 (2d Cir. 2013); Talavera v. Astrue, 697 F.3d 145, 151 (2d Cir. 2012); see generally 42 U.S.C. § 405(g) ("The findings of the Commissioner of Social Security as to any fact, if supported by substantial evidence, shall be conclusive . . . .").  Substantial evidence is "'more than a mere scintilla.  It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'"  Richardson v. Perales, 402 U.S. 389, 401 (1971) (quoting Consol. Edison Co. v. N.L.R.B., 305 U.S. 197, 229 (1938)); accord Burgess v. Astrue, 537 F.3d 117, 127–28 (2d Cir. 2008); Matthews v. Leavitt, 452 F.3d 145, 152 n.9 (2d Cir. 2006); Shaw v. Chater, 221 F.3d 126, 131 (2d Cir. 2000).

"Even where the administrative record may also adequately support contrary findings on particular issues, the ALJ's factual findings must be given conclusive effect so long as they are supported by substantial evidence." Genier v. Astrue, 606 F.3d 46, 49 (2d Cir. 2010) (citation and internal quotation marks omitted).  Thus, "[i]f the reviewing court finds substantial evidence to support the Commissioner's final decision, that decision must be upheld, even if substantial

16

evidence supporting the claimant's position also exists." Johnson v. Astrue, 563 F. Supp. 2d 444, 454 (S.D.N.Y. 2008) (citing Alston v. Sullivan, 904 F.2d 122, 126 (2d Cir. 1990) ("Where there is substantial evidence to support either position, the determination is one to be made by the factfinder.")). "The role of the reviewing court is therefore quite limited and substantial deference is to be afforded the Commissioner's decision." Id. (citations and internal quotation marks omitted). The Second Circuit has characterized the substantial evidenced standard as "a very deferential standard of review — even more so than the 'clearly erroneous' standard." Brault v. Soc. Sec. Admin., Comm'r, 683 F.3d 443, 448 (2d Cir. 2012) (citation omitted). The "substantial evidence" standard means that "once an ALJ finds facts, [a court] can reject those facts only if a reasonable factfinder would have to conclude otherwise." Id. (emphasis in original) (citation and internal quotation marks omitted).

    B.    Standard Governing Evaluation of Disability Claims by the ALJ

    The Social Security Act defines the term "disability" as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months . . . ." 42 U.S.C. § 423(d)(1)(A). A person will be found to be disabled only if it is determined that his "impairments are of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy . . . ." Id. § 423(d)(2)(A).

    To evaluate a Social Security claim, the Commissioner is required to examine: "(1) the objective medical facts; (2) diagnoses or medical opinions based on such facts; (3) subjective evidence of pain or disability testified to by the claimant or others; and (4) the claimant's

educational background, age, and work experience."  Mongeur v. Heckler, 722 F.2d 1033, 1037 (2d Cir. 1983) (per curiam) (citations omitted).

Regulations issued pursuant to the Social Security Act set forth a five-step process that the Commissioner must use in evaluating a disability claim.  See 20 C.F.R. §§ 404.1520(a)(4), 416.920(a)(4); see also Burgess, 537 F.3d at 120 (describing the five-step process).  First, the Commissioner must determine whether the claimant is currently engaged in any "substantial gainful activity."  20 C.F.R. §§ 404.1520(a)(4)(i), 416.920(a)(4)(i).  Second, if the claimant is not engaged in substantial gainful activity, the Commissioner must decide if the claimant has a "severe medically determinable physical or mental impairment," id. §§ 404.1520(a)(4)(ii), 416.920(a)(4)(ii), which is an impairment or combination of impairments that "significantly limits [the claimant's] physical or mental ability to do basic work activities . . . ," id. §§ 404.1520(c), 416.920(c).  Third, if the claimant's impairment is severe and is listed in 20 C.F.R. Part 404, Subpt. P, App. 1, or is equivalent to one of the listed impairments, the claimant must be found disabled regardless of his age, education, or work experience.  Id. §§ 404.1520(a)(4)(iii), 416.920(a)(4)(iii).  Fourth, if the claimant's impairment is not listed and is not equal to one of the listed impairments, the Commissioner must review the claimant's residual functional capacity to determine if the claimant is able to do work he or she has done in the past, i.e., "past relevant work."  Id. §§ 404.1520(a)(4)(iv), 416.920(a)(4)(iv).  If the claimant is able to do such work, he or she is not disabled.  Id. §§ 404.1520(a)(4)(iv), 416.920(a)(4)(iv).  Finally, if the claimant is unable to perform past relevant work, the Commissioner must decide if the claimant's residual functional capacity permits the claimant to do other work.  Id. §§ 404.1520(a)(4)(v), 416.920(a)(4)(v).  If the claimant cannot perform other work, he or she will be deemed disabled.  Id. §§ 404.1520(a)(4)(v), 416.920(a)(4)(v).  The claimant bears the

burden of proof on all steps except the final one — that is, proving that there is other work the claimant can perform.  See Poupore v. Astrue, 566 F.3d 303, 306 (2d Cir. 2009) (per curiam).

III.    DISCUSSION

Jimenez seeks reversal of the ALJ's determination on three grounds: (1) the ALJ violated the "treating physician rule" in rejecting Dr. Jean-Jeune's opinion, see Pl. Mem. at 10–14; (2) the ALJ improperly weighed the evidence in determining Jimenez's RFC, see id. at 14–17; and (3) the ALJ improperly evaluated Jimenez's credibility, see id. at 18–21.  The Court concludes that the case must be remanded because the record is not sufficiently clear that the ALJ's decision conforms with the "treating physician rule."

A.    Treating Physician Rule

Jimenez argues that the ALJ improperly evaluated Dr. Jean-Jeune's opinion.  Pl. Mem. at 10–14.  In general, the ALJ must give "more weight to opinions" of the claimant's treating physician when determining if a claimant is disabled.  See 20 C.F.R. §§ 404.1527(c)(2), 416.927(c)(2); see also Halloran v. Barnhart, 362 F.3d 28, 31 (2d Cir. 2004) (the ALJ must give "a measure of deference to the medical opinion of a claimant's treating physician").  Treating physicians "may bring a unique perspective to the medical evidence that cannot be obtained from the objective medical findings alone or from reports of individual examinations, such as consultative examinations . . . ."  20 C.F.R. §§ 404.1527(c)(2), 416.927(c)(2).  An ALJ must accord "controlling weight" to a treating physician's medical opinion as to the nature and severity of a claimant's impairments if the opinion "is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in [the claimant's] case record . . . ."  Id. §§ 404.1527(c)(2), 416.927(c)(2).  Inversely, the opinions of a treating physician "need not be given controlling weight where they are

contradicted by other substantial evidence in the record." Veino v. Barnhart, 312 F.3d 578, 588 (2d Cir. 2002) (citations omitted).

If the ALJ does not give controlling weight to a treating physician's opinion, the ALJ must provide "good reasons" for the weight given to that opinion. Halloran, 362 F.3d at 32–33 (citing Schaal v. Apfel, 134 F.3d 496, 505 (2d Cir. 1998)) (internal quotation marks omitted). When assessing how much weight to give the treating source's opinion, the ALJ should consider factors set forth in the Commissioner's regulations, which include: (i) the length of the treatment relationship and the frequency of the examination; (ii) the nature and extent of the treatment relationship; (iii) the supportability of the opinion with relevant evidence, particularly medical signs and laboratory findings; (iv) the consistency of the opinion with the record as a whole; (v) whether the opinion is from a specialist; and (vi) other relevant evidence. See 20 C.F.R. §§ 404.1527(c)(2), 416.927(c)(2); see also Ellington v. Astrue, 641 F. Supp. 2d 322, 330–31 (S.D.N.Y. 2009) ("the ALJ should weigh the treating physician's opinion along with other evidence according to the factors" listed in 20 C.F.R. §§ 404.1527(c)(2)–(6)). Courts "do not hesitate to remand when the Commissioner has not provided 'good reasons' for the weight given to a treating physician[']s opinion and [should] continue remanding when [they] encounter opinions from ALJ's that do not comprehensively set forth reasons for the weight assigned to a treating physician's opinion." Halloran, 362 F.3d at 33.

In according "[l]ittle weight" to Dr. Jean-Jeune's opinion that Jimenez was unable to work, the ALJ first stated that the determination of a claimant's RFC and whether a claimant was able to work are issues "reserved to the Commissioner" to decide. R. 24 (citation omitted). The fact that these issues are reserved for the Commissioner to decide, however, provides no basis to discredit a treating source's opinion inasmuch as Social Security regulations require the ALJ to

"always carefully consider medical source opinions about any issue, including opinions about issues that are reserved to the Commissioner."  SSR 96–5P, 1996 WL 374183, at *2 (July 2, 1996); accord Snell v. Apfel, 177 F.3d 128, 134 (2d Cir. 1999) ("Reserving the ultimate issue of disability to the Commissioner relieves the Social Security Administration of having to credit a doctor's finding of disability, but it does not exempt administrative decisionmakers from their obligation . . . to explain why a treating physician's opinions are not being credited.").

Second, the ALJ noted that Dr. Jean-Jeune's opinion that Jimenez was unable to work, as stated in the October 31, 2008 Wellness Plan Report and the September 10, 2010 Questionnaire, was inconsistent with other substantial evidence in the record.  R. 24.  Specifically, the ALJ found that her opinion was inconsistent with her own prior statement in the August 21, 2008 Wellness Plan Report in which she stated that Jimenez was only "temporarily unemployable." Id. (citing to R. 179).  The purported inconsistency in Dr. Jean-Jeune's opinion could easily be explained by the gap in time among the reports, however.  See, e.g., Balodis v. Leavitt, 704 F. Supp. 2d 255, 267 n.13 (E.D.N.Y. 2010) (purported inconsistency in treating physician's opinion could be explained by gap in time and claimant's deteriorating condition); Richardson v. Barnhart, 443 F. Supp. 2d 411, 421 (W.D.N.Y. 2006) (citing Harris v. R.R. Ret. Bd., 948 F.2d 123, 127 (2d Cir. 1991)) ("[A] treating physician's change of opinion over time concerning the assessment of a patient's condition does not necessarily establish a fatal inconsistency.").  This is especially true where "the physician acquired additional medical evidence during the time period between her initial assessment and later statement."  Richardson, 443 F. Supp. 2d at 421 (emphasis in original).  Given that Dr. Jean-Jeune began treating Jimenez as early as August 2008 but did not fill out the second Wellness Report or the Questionnaire until months or years

later, R. 179–81, 298–302, a deterioration in Jimenez's condition or the discovery of new

medical evidence during the treatment could explain any apparent inconsistency in the opinions.

"[I]f a physician's report is believed to be insufficiently explained, lacking in support, or

inconsistent with the physician's other reports, the ALJ must seek clarification and additional

information from the physician, as needed, to fill any clear gaps before rejecting the doctor's

opinion." Correale-Englehart v. Astrue, 687 F. Supp. 2d 396, 428 (S.D.N.Y. 2010) (citation

omitted); accord Rosa v. Callahan, 168 F.3d 72, 79 (2d Cir. 1999).  "This is because an 'ALJ

generally has an affirmative obligation to develop the administrative record,' which 'exists even

when the claimant is represented by counsel.'" Rogers v. Astrue, 895 F. Supp. 2d 541, 549

(S.D.N.Y. 2012) (quoting Perez v. Chater, 77 F.3d 41, 47 (2d Cir. 1996)).  Moreover, although

the Social Security Administration recently changed its regulations to reduce the situations in

which an ALJ must recontact medical providers, the regulations still contemplate the ALJ

recontacting treating physicians when "the additional information needed is directly related to

that source's medical opinion."  See How We Collect and Consider Evidence of Disability, 77

Fed. Reg. 10,651-01, 10,652 (Feb. 23, 2012).  Here, the ALJ never recontacted Dr. Jean-Jeune to

clarify any purported inconsistency in her opinions.[15]

Finally, the ALJ did not give sufficient reasons as to why he found that Dr. Jean-Jeune's

opinion was "not well-supported by medically acceptable clinical and laboratory diagnostic

techniques."  R. 24; see generally 20 C.F.R. §§ 404.1527(c)(2), 416.927(c)(2) (listing factors to

be considered).  The ALJ did not discuss the length, frequency, or nature of the treating

---

[15] The Court expresses no opinion on whether Dr. Jean-Jeune's reports are in fact
inconsistent – a matter that the ALJ is free to re-evaluate.   The problem here is that, having
found an unexplained inconsistency that was seemingly material to his decision to accord the
opinion little weight, no steps were taken to seek clarification.

relationship.  See R. 24.  Nor did the ALJ give a specific explanation as to why Dr. Jean-Jeune's opinion was inconsistent with other substantial evidence in the record.  Here, the failure to apply factors contained in 20 C.F.R. §§ 404.1527(c)(2), 416.927(c)(2) provides a reason to remand.  See Schaal, 134 F.3d at 505; Sava v. Astrue, 2009 WL 6763964, at *5–7 (S.D.N.Y. Oct. 2, 2009) (remanding where ALJ rejected treating physician's opinion without analysis of 20 C.F.R. § 404.1527(c)(2) factors), adopted, 2010 WL 3219311 (S.D.N.Y. Aug. 12, 2010).

Accordingly, the case is remanded to the Commissioner to explain the weight placed on Dr. Jean-Jeune's opinion and to recontact Dr. Jean-Jeune to clarify any perceived inconsistencies in her opinions.  If, following remand, the ALJ adheres to his conclusions, he should explain the factors applied in determining the amount of weight given to Dr. Jean-Jeune's opinion and identify the substantial evidence in support of the finding.

    B.    ALJ's Assessment of Jimenez's RFC

Jimenez contends that the ALJ improperly assessed the evidence in determining her RFC.  Pl. Mem. at 14–17.  "Ordinarily, RFC is the individual's maximum remaining ability to do sustained work activities in an ordinary work setting on a regular and continuing basis, and the RFC assessment must include a discussion of the individual's abilities on that basis."  Melville v. Apfel, 198 F.3d 45, 52 (2d Cir. 1999) (citation and internal quotation marks omitted).  In assessing the RFC, the ALJ is to consider all of the "medically determinable impairments" and "all of the relevant medical and other evidence."  20 C.F.R. §§ 404.1545(a)(2)–(3), 416.945(a)(2)–(3).  "A finding as to RFC will be upheld on review when there is substantial evidence in the record to support the requirements listed in the regulations."  Gillespie v. Astrue, 2012 WL 3646820, at *11 (E.D.N.Y. Aug. 23, 2012).

Because the case is to be remanded to the ALJ to reconsider Dr. Jean-Jeune's opinion, it is unnecessary to determine whether the ALJ improperly assessed Jimenez's RFC. Nonetheless, we believe the record could be improved if the ALJ more fully explains how he determined Jimenez's RFC. With respect to Jimenez's physical limitations, the ALJ did not explain what evidence specifically supported the conclusion that Jimenez could perform light work. See R. 23–24; see also SSR 96–8p, 1996 WL 374184, at *7 (July 2, 1996) ("The RFC assessment must include a narrative discussion describing how the evidence supports each conclusion, citing specific medical facts (e.g., laboratory findings) and nonmedical evidence (e.g., daily activities, observations)."). Also, the ALJ should more fully explain how Jimenez's mental impairments affect her RFC on remand. For example, the ALJ should explain how Jimenez's "severe" mental impairments of anxiety and depression, R. 21 — which, by their definition, significantly limit her "basic work activities," see 20 C.F.R. §§ 404.1521, 416.921 — affect her RFC. See id. §§ 404.1545(a)(2), 416.945(a)(2); Gray v. Astrue, 2007 WL 2874049, at *7 (S.D.N.Y. Oct. 3, 2007) ("If the ALJ found that the claimant suffers from a mental impairment, . . . she had a duty to take that into account when determining the claimant's capabilities."), modified on other grounds, 2009 WL 1598798 (S.D.N.Y. June 8, 2009).

     C.     Determination of Credibility

Finally, Jimenez contends that the ALJ improperly evaluated her credibility. Pl. Mem. at 18–21. The Second Circuit has held that where an ALJ rejects witness testimony as not credible, the basis for the finding "must . . . be set forth with sufficient specificity to permit intelligible plenary review of the record." Williams ex rel. Williams v. Bowen, 859 F.2d 255, 260–61 (2d Cir. 1988) (citing Carroll v. Sec'y of Health & Human Servs., 705 F.2d 638, 643 (2d Cir. 1983)); accord Snell, 177 F.3d at 135. The ALJ must make this determination "in light of the medical

24

findings and other evidence regarding . . . the true extent of the pain alleged by the claimant." Mimms v. Heckler, 750 F.2d 180, 186 (2d Cir. 1984) (citation and internal quotation marks omitted).

Because the case is to be remanded to the Commissioner, it is unnecessary to determine whether the ALJ erred in assessing Jimenez's credibility.  We note, however, the ALJ should explicitly consider Jimenez's substantial work history in conducting this assessment. See generally Sheldon v. Comm'r of Soc. Sec., 2009 WL 5216957, at *6 (N.D.N.Y. Dec. 30, 2009) ("[A]n ALJ is required to take into account a claimant's work history because, '[a] claimant with a good work record is entitled to substantial credibility when claiming an inability to work because of a disability.'") (second alteration in original) (quoting Rivera v. Schweiker, 717 F.2d 719, 725 (2d Cir. 1983)); McCarthy v. Astrue, 2007 WL 4444976, at *8 (S.D.N.Y. Dec. 18, 2007) ("[A] credibility determination should take account of prior work history.").

IV.    CONCLUSION

For the foregoing reasons, the Commissioner's motion for judgment on the pleadings (Docket # 11) is denied.  Jimenez's motion for judgment on the pleadings (Docket # 15) is granted.  The case is remanded for further proceedings consistent with this Opinion and Order. The Clerk is requested to enter judgment and to close this case.

Dated:  August 13, 2013
        New York, New York

GABRIEL W. GORENSTEIN
United States Magistrate Judge